IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY ROSS, | : | CIVIL NO. 1:11-CV-838 |
| | : | |
| Petitioner, | : | (Judge Caldwell) |
| | : | |
| v. | : | |
| | : | (Magistrate Judge Carlson) |
| DAVID VARANO, et al., | : | |
| | : | |
| Respondents. | : | |

## REPORT AND RECOMMENDATION

I.   **Statement of Facts and of the Case**

A.   **Ross' State Prosecution and Efforts to Appeal**

The pertinent facts in this case can be simply stated.  The petitioner in this case, Timothy Ross, is a convicted murderer who is currently serving a life sentence for his role in the March 1, 1999 shooting death of Drake Luckett at Dave's Tavern, in Chambersburg, Pennsylvania.  Ross, who is now 38 years old, has a ninth-grade education, and by his own admission spent much of his youth in special educational programs.  He suffers from a cascading array of significant mental health issues, including chronic depression, paranoid moods, ADHD, self-mutilation, anxiety, and suicidal thoughts. (Exs. 34-36.[1])  According to Ross' federal habeas corpus petition, in June of 2000,  Ross was convicted in the Court of Common Pleas of Franklin

_____

[1]These exhibit references refer to exhibits introduced in a November 2011 hearing conducted by the Court.

County of first-degree murder and was sentenced to life imprisonment without parole for his role in the shooting death of Luckett. (Doc 1,¶2)

Following this conviction, on July 11, 2000, counsel was appointed to represent Ross in post-conviction proceedings his state murder case, a case in which Ross' life literally hung in the balance.  The record of that state court representation is marked by a pattern of diligent efforts by Ross, a man of limited abilities, to preserve his appellate rights in the face of complete inaction by his counsel.  This pattern began within days of counsel's appointment, on July 31, 2000, when Ross wrote to counsel, seeking his help on appeal and outlining the appellate issues that Ross had identified in this murder case. (Ex. 1.)  Ross' letter can only be construed as an unambiguous request to lodge an appeal on his behalf in this state murder case.

Despite this request, Ross received no answer from his counsel to this July 31 letter.  After six weeks elapsed without a reply from counsel, Ross wrote again to counsel in September of 2000. (Ex. 2.)  Ross repeated his desire that an appeal be filed, stating that he was "losing my mind in the dark," and urged counsel to "please get back to me as soon as possible." (Id.)  Counsel never replied to this September 2000 letter from Ross voicing concerns about his appeal deadlines.  In fact, Ross' anxiety in the Fall of 2000 regarding the timeliness of his appeal was well-founded, since even as he was writing these letters, the 30-day deadline for filing a notice of

appeal from this murder conviction and life sentence was arguably lapsing.  Pa.R.A.P. 903(c)(3).

When another month passed without any communication from his counsel, Ross wrote to counsel on October 4, 2000, asking for basic information regarding the status of his appeal. (Ex. 3.)  Apologizing for his persistence, Ross stated "I'm not trying to make you madd[sic] or anything but my life is on the line." Ross then urged his counsel to act, begging his counsel "please don't leave me in the dark." (Id.)  Counsel never replied to this letter, and took no immediate action to pursue an appeal.

Frustrated by the complete failure of court-appointed post-conviction counsel to act, or even acknowledge his letters, Ross followed several other avenues of relief in an effort to preserve his appeal rights.  First, Ross wrote to his former trial counsel in October, 2000, seeking assistance. (Ex. 4.)  Trial counsel referred Ross' letter to the attorney appointed to assist Ross on appeal, who took no action to follow up on Ross' appeal. (Id.)  In addition, Ross wrote the clerk of court, seeking on his own initiative to learn what steps he needed to take to pursue an appeal since his appellate counsel was refusing to communicate with him. (Ex. 5.)

By December of 2000, Ross' persistence finally yielded an initial, halting response from his counsel, who filed a motion for leave to appeal *nunc pro tunc*, a motion which was granted by the trial court on December 13, 2000. (Exs. 6 and 7.) While counsel took this initial, tentative step five months after being appointed to

represent Ross, counsel neglected to inform Ross of the action he had taken.  Thus, Ross received no notice from his counsel of this filing.  Left uninformed by his attorney regarding the status of his case as 2000 drew to a close, Ross continued to struggle in the coming months to pursue his appeal, only to have his counsel actually *withdraw* the belated notice of appeal which was initially, and belatedly, filed on Ross' behalf.

Ross' state appellate misadventures continued in January of 2001, when Ross, who was plainly frustrated by the complete lack of action or communication from counsel, requested appointment of new counsel from the court. (Exs. 8-10.)  In light of counsel's December 2000 filing of a motion for leave to file notice of appeal *nunc pro tunc*, this request was denied by the state trial court, and Ross was left to prosecute this appeal with his original court-appointed counsel.  Informed that his initial court-appointed appellate counsel would remain assigned to this case, Ross then wrote to that counsel yet again on January 15, 2001. (Ex. 11.)  In this January 15 letter, Ross asked for copies of the appeal documents in the case, and apologized to counsel, while underscoring for his attorney the importance of action on this appeal, stating:  "This is a one shot deal and my life depends on it." (Id.)  Thus, Ross, once again, plainly evinced a desire to appeal his conviction and sentence.  Ross' counsel never replied to this letter.

Five months passed without any action by counsel. Then, in May 2001, defense counsel was contacted by court staff regarding his failure to take any further steps to pursue the appeal of Ross' murder conviction. (Ex. 12.) In response to this direct inquiry from the Court, Ross' counsel finally filed a notice of appeal in this matter on May 9, 2001, almost 11 months after Ross' conviction and sentence. (Ex. 13.) Counsel then traveled to the prison where Ross was housed and met with him to discuss his case on June 8, 2001. (Ex. 14.) While Ross' former state post-conviction counsel could provide the Court with no coherent description of his communications with Ross throughout this period, and indeed was unable to recall any material aspect of this chronology of events, the record of the state proceedings reveals that counsel followed a puzzling, erratic course in this case in the summer of 2001. Ultimately, defense counsel's choices led counsel to abandon the appeal which Ross had repeatedly urged him to pursue, ostensibly in favor of post-trial motions, motions that counsel then neglected to file.

This confusing defense strategy first manifested itself on June 11, 2001, when Ross' counsel filed a procedurally inappropriate motion to withdraw the direct appeal he had lodged in Ross' case with the Court of Common Pleas. (Ex. 15.) Given the inappropriate nature of this filing, which should have been submitted to the Pennsylvania Superior Court, the Common Pleas Court judge entered an order on June 18, 2001, simply authorizing counsel to petition the Pennsylvania Superior Court for

leave to withdraw this appeal. (Ex. 16.)  However, the trial court also instructed counsel in clear and precise terms to file post trial motions *nunc pro tunc* "no later than thirty (30) days from the date the defendant's withdrawal of direct appeal is granted." (Id.)

Ross seems to have been largely unaware of these actions by his counsel, or their implications for his appellate rights.  Thus, in July of 2001, Ross wrote to counsel inquiring into the status of this litigation, and requesting copies of the documents filed in his case. (Ex. 17.)  There is no indication that counsel ever replied to this request from Ross.  Instead, on August 30, 2001, counsel petitioned the Superior Court, requesting to discontinue this appeal, a request which was granted in early September 2001. (Exs. 18, 19, and 20.)

At the time that Ross' counsel abandoned this appeal, he was under a court-ordered obligation from the Court of Common Pleas to file post-trial motions *nunc pro tunc* "no later than thirty (30) days from the date the defendant's withdrawal of direct appeal is granted." (Ex. 16.)  Counsel ignored this court-ordered mandate, and took no steps to file post-trial motions after withdrawing Ross' appeal.  Nor did counsel inform Ross that his appeal had been abandoned, a fact which was starkly illustrated one month later by Ross' October 17, 2001 letter to counsel which "ask[ed] whats [sic] going on with my appeal." (Ex. 21.)  Ross' inquiries were greeted by silence; there is no record that counsel ever informed Ross at this time that he had withdrawn this

appeal.  Instead, after several months of inaction, in response to Ross' repeated requests, counsel forwarded the transcript of Ross' trial to the petitioner in December 2001, some 18 months after Ross' conviction and sentence. (Ex. 22.)  Yet, even as counsel provided this rudimentary information to Ross, he failed to disclose a greater truth to the petitioner.  Counsel did not disclose the fact that he had withdrawn Ross' appeal months earlier, and had taken no further action to pursue any post-conviction relief for Ross.

Unaware of the wholesale abandonment of this appeal by counsel, and undaunted in his efforts to pursue an appeal, Ross wrote to counsel in July 2002 and on January 8, 2003, suggesting legal avenues to pursue on appeal, requesting updates on the status of the appeal, and threatening to contact the state court judge, or pursue other avenues of relief, if he did not hear from his counsel. (Ex. 23 and 24.) Eventually these increasingly urgent letters inspired a response from counsel, albeit a response which in many ways reflected counsel's indifference to his client's plight. On March 25, 2003[2], counsel wrote to Ross. Counsel's letter reflected both lethargy and a lack of candor. Reporting that, "I just noticed your letter of January 8, 2003," which asked about the status of the appeal, counsel stated:  "I will be following up on

---

[2]With the type of lack of attention to detail which had marked other aspects of his representation of Ross, this letter from counsel was erroneously dated "March 25, 2008", but appears actually to have been written five years earlier, on March 25, 2003.

your matter to see exactly where it stands." (Ex. 25.)  In fact, counsel should not have had to "follow[] up to see exactly where" Ross' appeal stood.  The appeal stood where counsel had left it 18 months earlier in September of 2001.  It stood neglected, discarded and abandoned.  Counsel then promised Ross that "[a]s soon as I realize what is going on I'll let you know", while actively discouraging Ross from calling his office, telling Ross not to "be offended if I am unable to take a call from you." (Id.)

Ross immediately responded to this correspondence, the first substantive communication from his counsel in over a year, writing counsel a detailed letter on March 31, 2003. (Ex. 26.)  In that March 31, 2003  letter, Ross urged his counsel to act, cogently outlined avenues of appeal, and plaintively asked his counsel to "let me know the outcome of the appeal and send me copies." (Id.)  Counsel did not respond to this letter, compelling Ross to write again on May 18, 2003, and adopt a different, and more threatening,  approach as part of his continuing efforts to inspire some action by counsel. (Ex. 27.)  In this May 18, 2003 letter, Ross demanded action from counsel, noting that his attorney had been appointed to represent him on appeal for 34 months, since July of 2000.  In desperation Ross also threatened to report counsel to the bar disciplinary authorities if he did not pursue this appeal. (Id.)

This letter inspired a response from counsel on May 30, 2003. (Ex. 28.) Counsel's May 30, 2003 letter to Ross revealed, apparently for the first time, that he had withdrawn Ross' appeal.  Counsel then suggested that the "file" had been lost in

the Superior Court, but stated "I will be moving to place your matter back on the court docket." (Id.)  The letter provided absolutely no explanation regarding how counsel proposed to place Ross' case on some docket three years after Ross' trial, conviction and sentence, and 21 months after counsel withdrew Ross' appeal.   Indeed, the bankrupt nature of this promise by counsel to Ross was graphically illustrated at a November 3, 2011 hearing conducted by this Court when counsel was unable to provide any coherent explanation regarding how he could achieve this feat, beyond asserting that he would have moved for some sort of evidentiary hearing.[3]  Counsel then closed this letter by advising Ross to "rest assured that it is my desire to do my best for you." (Id.)  Lulled by this correspondence, Ross wrote to his attorney on June 14, 2003, urging him to immediately file a *nunc pro tunc* notice of appeal, and explaining that "maybe you do not know or understand what 'natural life imprisonment' is but . . . its [sic] pretty serious . . . . I need my case to start moving . . . ." (Ex. 29.)  Ross' counsel did not keep his May 30, 2003 promise "to place your

---

[3]In fact, it appears that by this time–May 2003–counsel's inaction had largely forfeited Ross' rights since the time for taking a direct appeal had lapsed, Pa.R.A.P. 903(c)(3), and the one-year deadline for filing a post-conviction relief act petition under Pennsylvania law had also passed. 42 Pa.C.S. § 9545(b)(1). In a telling exchange at the November 3, 2011 hearing, Ross' former counsel was seemingly unaware of these deadlines, guessing that the deadline for filing a post-conviction relief act petition was either one or two years. Counsel also appeared to be wholly unaware of the fact that these deadlines had passed entirely due to his inaction.

matter back on the court docket." (Ex. 28.)  Nor did counsel respond to Ross' June 14, 2003, letter urging action on this appeal.  In fact, counsel did nothing.

While Ross' counsel exhibited this complete indifference, Ross himself continued to display diligence in this matter.  Thus, on September 6, 2003, Ross wrote to counsel seeking information on the status of his appeal, and stating that he had no "idea whats [sic] going on with this appeal." (Ex. 30.)  Ross' counsel responded to this letter on September 11, 2003, making a series of promises which he never kept, and stating: "I am in the process of filing a *Nunc Pro Tunc* appeal on your behalf . . . . I plan to file your *Nunc Pro Tunc* appeal by the end of this month." (Ex. 31.)  This statement, which proved to be flatly inaccurate, appears to have been counsel's last documented communication with Ross.  In truth, no appeal was filed and no action was taken by Ross' counsel after September 2003 in this case.  Ross, however, apparently continued to hold out hope for this appeal for several years, writing periodically to the Court seeking information on the status of his case, (Exs. 32 and 33), and endeavoring unsuccessfully to receive information concerning the status of this appeal.

### B.    Ross' PCRA Proceedings

By July 2008, Ross came to recognize that he had been abandoned by counsel, and filed a *pro se* motion for post-conviction relief with the Court of Common Pleas. Confronted with years of inaction by Ross' first court-appointed counsel, the state trial

court appointed new counsel for Ross.   In a telling and tacit recognition of the extraordinary circumstances of this case, the Commonwealth, Ross' new counsel, and the state trial court then agreed to reinstate Ross' direct appeal rights, and authorized him to finally pursue this long delayed direct appeal of his conviction.

However, when Ross pursued this appeal, it was quashed by the Pennsylvania Superior Court in an opinion and order dated September 28, 2010. (Doc. 1, Ex. 3.)  In that September 28, 2010 opinion, the Superior Court, which was evidently unaware of Ross' tortured history with his prior counsel, simply found that the appeal did not fall within any clearly recognized statutory exceptions under the state post-conviction relief act, authorizing reinstatement of appellate rights.   On the basis of this reading of state law, and without the benefit of the disturbing factual context of this case, the Superior Court then quashed and dismissed Ross' appeal.

According to the respondents, following this ruling Ross endeavored to file two more PCRA petitions in state court, in an effort to reinstate his appellate rights. (Doc. 26, pp. 2-3)  Both of these PCRA petitions were denied, however, by the state courts. (Id.)

### C.   Ross' Federal Habeas Petition

Frustrated in his efforts to secure his appeal rights in state court, Ross filed the instant federal habeas corpus petition in May of 2011, which sought the reinstatement

of his direct appeal rights. (Doc. 1)  The respondents initially opposed this request, and moved to dismiss this petition, citing the one-year statute of limitations that generally applies to state habeas actions under 28 U.S.C. § 2244.(Doc. 10)  This motion was briefed by the parties, (Docs. 1, 10 and 11), and a hearing was held on November 3, 2011, to fully develop the factual record on this matter.  Following that hearing, on November 4, 2011, we issued a report and recommendation, (Doc. 23),which found that Ross was entitled to equitable tolling of the statute of limitations due to the wholesale abandonment of his defense by his first post-conviction state defense counsel, an abandonment that was compounded by counsel's misstatements and concealment of material facts from Ross.  Therefore, we recommended that this motion to dismiss (Doc. 10), be denied, and that the parties address the merits of Ross' claim that he is entitled to reinstatement of his appellate rights due to the failure of state post-conviction counsel to preserve those rights by abandoning his appeal.

On December 29, 2011, the District Court adopted this report and recommendation, and remanded this Court to the undersigned for further proceedings. (Doc. 31)  The parties, in turn, filed supplemental briefs relating to the merits of Ross' petition. (Docs. 24-26)   In these supplemental pleadings, the respondents have suggested that Ross' claims are not fully exhausted, and should, therefore, be dismissed.  Having carefully considered this exhaustion argument we find that the exhaustion doctrine should not be a bar to consideration of this petition on its merits.

Moreover, our examination of the merits of Ross' petition leads us to conclude that Ross is entitled to narrow relief in the form of reinstatement of his direct appeal in state court, a direct appeal denied Ross through the inaction of his first state post-conviction counsel.

## II.   Discussion

### A.   State Prisoner Habeas Relief–The Legal Standard

A state prisoner seeking to invoke the power of this Court to issue a writ of habeas corpus must satisfy the standards prescribed by 28 U.S.C. § 2254, which provides in part as follows:

> **(a)** The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

> **(b)(1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–

>> **(A)** the applicant has exhausted the remedies available in the courts of the State;
>> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

> **(2)** An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

28 U.S.C. § 2254 (a) and (b)

## 1.    <u>Substantive Standards for Habeas Petitions</u>

As this statutory text implies, state prisoners must meet exacting substantive and procedural benchmarks in order to obtain habeas corpus relief.  At the outset, a petition must satisfy exacting substantive standards to warrant relief.  Federal courts may "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  By limiting habeas relief to state conduct which violates "the Constitution or laws or treaties of the United States," § 2254 places a high threshold on the courts.  Typically, habeas relief will only be granted to state prisoners in those instances where the conduct of state proceedings led to a "fundamental defect which inherently results in a complete miscarriage of justice" or was completely inconsistent with rudimentary demands of fair procedure. <u>See, e.g., Reed v. Farley</u>, 512 U.S. 339, 354 (1994).  Thus, claimed violations of state law, standing alone, will not entitle a petitioner to § 2254 relief, absent a showing that those violations are so great as to be of a constitutional dimension. <u>See</u> <u>Priester v. Vaughan</u>, 382 F.3d 394, 401-02 (3d Cir. 2004).

## 2.   Ineffective Assistance of Counsel on Appeal–Legal Standards

It is beyond dispute that federal habeas relief is available to state prisoners who are denied the effective assistance of counsel on direct appeal.   The standards governing ineffective assistance of counsel claims in this context are also well settled. It is undisputed that the Sixth Amendment to the United States Constitution guarantees the right of every criminal defendant to effective assistance of counsel.   Under federal law, a collateral attack of a conviction based upon a claim of ineffective assistance of counsel must meet a two-part test established by the Supreme Court in order to survive.   Specifically, to prevail on a claim of ineffective assistance of counsel, a petitioner must establish that:  (1) the performance of counsel fell below an objective standard of reasonableness; and (2) that, but for counsel's errors, the result of the underlying proceeding would have been different.   Strickland v. Washington, 466 U.S. 668, 687-88, 691-92 (1984).   A petitioner must satisfy both of the Strickland prongs in order to maintain a claim of ineffective counsel.   George v. Sively, 254 F.3d 438, 443 (3d Cir. 2001).

At the outset, Strickland  requires a petitioner to "establish first that counsel's performance was deficient."  Jermyn v. Horn, 266 F.3d 257, 282 (3d Cir. 2001).  This threshold showing requires a petitioner to demonstrate that counsel made errors "so serious" that counsel was not functioning as guaranteed under the Sixth Amendment.

Id. Additionally, the petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Id. However, in making this assessment "[t]here is a 'strong presumption' that counsel's performance was reasonable." Id. (quoting Berryman v. Morton, 100 F.3d 1089, 1094 (3d Cir. 1996)). But a mere showing of deficiencies by counsel is not sufficient to secure habeas relief. Under the second Strickland prong, a petitioner also "must demonstrate that he was prejudiced by counsel's errors." Id. This prejudice requirement compels the petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. A "reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." Id. Thus, as set forth in Strickland, a petitioner claiming that his criminal defense counsel was constitutionally ineffective must show that his lawyer's "representation fell below an objective standard of reasonableness." 466 U.S. at 688.

In this specific factual context, however, where it appears that counsel received repeated, timely requests to pursue an appeal from his client, several other guiding principles may apply. First, the United States Supreme Court has:

> [L]ong held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable. See Rodriquez v. United States, 395 U.S. 327, 89 S.Ct. 1715, 23 L.Ed.2d 340 (1969); cf. Peguero v. United States, 526 U.S. 23,

28, 119 S.Ct. 961, 143 L.Ed.2d 18 (1999) ("[W]hen counsel fails to file a requested appeal, a defendant is entitled to [a new] appeal without showing that his appeal would likely have had merit").  This is so because a defendant who instructs counsel to initiate an appeal reasonably relies upon counsel to file the necessary notice. Counsel's failure to do so cannot be considered a strategic decision; filing a notice of appeal is a purely ministerial task, and the failure to file reflects inattention to the defendant's wishes.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000).

Thus, the unjustified failure to file a requested appeal is conduct which is inherently professionally unreasonable, and satisfies the first element of the Strickland standard for weighing the ineffectiveness of counsel.

Once this showing is made, case law also suggests that where:

[C]ounsel's deficient performance deprived [a petitioner] of a notice of appeal and, hence, an appeal altogether. . . , counsel's deficient performance has deprived [petitioner] of more than a *fair* judicial proceeding; that deficiency deprived [petitioner] of the appellate proceeding altogether. . . .[T]he complete denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice because "the adversary process itself" has been rendered "presumptively unreliable." The even more serious denial of the entire judicial proceeding itself, which a defendant wanted at the time and to which he had a right, similarly demands a presumption of prejudice. Put simply, we cannot accord any " 'presumption of reliability,' to judicial proceedings that never took place "

Roe v. Flores-Ortega, 528 U.S. at 483(citations omitted).

Therefore, in this setting: "To establish prejudice, 'a defendant must [simply] demonstrate that there is a reasonable probability that, but for counsel's [ineffective assistance], he would have timely appealed.' Flores-Ortega, 528 U.S. at 484, 120 S.Ct. 1029." Hodge v. United States, 554 F.3d 372, 381 (3d Cir. 2009). In sum, "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken, the defendant has made out a successful ineffective assistance of counsel claim entitling him to an appeal," without any further showing of prejudice. Roe v. Flores-Ortega 528 U.S. 470, 484-5.

### 3. Procedural Benchmarks for Habeas Petitions–The Exhaustion Doctrine and Procedural Default

Furthermore, state prisoners seeking relief under Section 2254 must also satisfy specific, and precise, procedural standards. Among these procedural prerequisites is a requirement that the petitioner " has exhausted the remedies available in the courts of the State" before seeking relief in federal court. 28 U.S.C. § 2254(b). In instances where a state prisoner has failed to exhaust the legal remedies available to him in the state courts, federal courts typically will refuse to entertain a petition for habeas corpus. See Whitney v. Horn, 280 F.3d. 240, 250 (3d Cir. 2002).

This statutory exhaustion requirement is rooted in principles of comity and reflects the fundamental idea that the state should be given the initial opportunity to pass upon and correct alleged violations of the petitioner's constitutional rights.

O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999).  As the Supreme Court has aptly observed: "a rigorously enforced total exhaustion rule" is necessary in our dual system of government to prevent a federal district court from upsetting a state court decision without first providing the state courts the opportunity to correct a constitutional violation.  Rose v. Lundy, 455 U.S. 509, 518 (1982).  Requiring exhaustion of claims in state court also promotes the important goal of ensuring that a complete factual record is created to aid the federal courts in their review of a § 2254 petition. Walker v. Vaughn, 53 F.3d 609, 614 (3d Cir. 1995).  A petitioner seeking to invoke the writ of habeas corpus, therefore, bears the burden of showing that all of the claims alleged have been "fairly presented" to the state courts, and the claims brought in federal court must be the "substantial equivalent" of those presented to the state courts.  Evans v. Court of Common Pleas, 959 F.2d 1227, 1231 (3d Cir. 1992); Santana v. Fenton, 685 F.2d 71, 73-74 (3d Cir. 1982).  A petitioner cannot avoid this responsibility merely by suggesting that he is unlikely to succeed in seeking state relief, since it is well-settled that a claim of "likely futility on the merits does not excuse failure to exhaust a claim in state court." Parker v.Kelchner, 429 F.3d 58, 63 (3d Cir. 2005).

While this exhaustion requirement compels petitioners to have previously given the state courts, a fair "opportunity to apply controlling legal principles to the facts bearing upon [the petitioner's] constitutional claim," Picard v. Connor, 404 U.S. 270, 276 (1971), this requirement is to be applied in a commonsense fashion.  Thus, the

exhaustion requirement is met when a petitioner submits the gist of his federal complaint to the state courts for consideration, without the necessity that the petitioner engage in some "talismanic" recitation of specific constitutional claims. <u>Evans</u>, 959 F.2d at 1230-33.  Similarly, a petitioner meets his obligations by fairly presenting a claim to the state courts, even if the state courts decline to specifically address that claim.  <u>See</u> <u>Dye v. Hofbauer</u>, 546 U.S. 1(2005) (per curiam); <u>Johnson v. Pinchak</u>, 392 F.3d 551, 556 (3d Cir. 2004).

In this regard, it has been observed that:

Pursuant to 28 U.S.C. § 2254(b)(1)(A), the federal courts may grant a state prisoner's habeas petition only if the petitioner "has exhausted the remedies available in the courts of the State." AEDPA's exhaustion requirement mandates that the claim "must have been 'fairly presented' to the state courts." <u>Bronshtein v. Horn</u>, 404 F.3d 700, 725 (3d Cir.2005) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). Fair presentation "means that a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." <u>Id.</u> at 725 (internal quotation marks & citations omitted). In other words, the petitioner must afford the state system "the opportunity to resolve the federal constitutional issues before he goes to the federal court for habeas relief." <u>Zicarelli v. Gray</u>, 543 F.2d 466, 472 (3d Cir.1976) ( <i>en banc</i>) (internal quotation marks & citations omitted). Fair presentation by the petitioner to the state courts is sufficient; the claims "need not have been considered or discussed by those courts." <u>Swanger v. Zimmerman</u>, 750 F.2d 291, 295 (3d Cir.1984) (citations omitted). To assess whether a pro se petitioner fairly presented claims to the state courts, we will construe the pleadings liberally. <u>Cf. United States v. Otero</u>, 502 F.3d 331, 334 (3d Cir.2007) (citing <u>Haines v. Kerner</u>, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). A habeas corpus petition prepared by a prisoner without legal assistance may not be skillfully drawn and should thus be

read generously. "It is the policy of the courts to give a liberal construction to pro se habeas petitions." <u>United States ex rel. Montgomery v. Brierley</u>, 414 F.2d 552, 555 (3d Cir.1969) (citation omitted).

<u>Rainey v. Varner</u>, 603 F.3d 189, 198 (3d Cir. 2010).

Furthermore, it is clear that the exhaustion doctrine is not a jurisdictional bar to judicial review of a claim, but rather a doctrine driven by considerations of comity, which is also subject to fundamental considerations of equity. As the United States Court of Appeals for the Third Circuit has aptly observed:

> Under ordinary circumstances, a federal court may not entertain a petition for a writ of habeas corpus unless the petitioner has first presented each of his claims to the state's highest tribunal. <u>See</u> 28 U.S.C. §§ 2254(b), (c); <u>Rose v. Lundy</u>, 455 U.S. 509, 515-16(1982). Exhaustion, however, is not a jurisdictional matter but a matter of comity. <u>See</u> <u>Story v. Kindt</u>, 26 F.3d 402, 405 (3d Cir.1994). Federal courts need not defer to the state judicial process when there is no appropriate remedy at the state level or when the state process would frustrate the use of an available remedy. <u>Id</u>.

<u>Lee v. Stickman</u>, 357 F.3d 338, 341 (3d Cir. 2004). Thus, where there has been an "inexcusable or inordinate delay" in addressing the merits of a petitioner's claims that delay may justify excusing the exhaustion requirement. In this regard, "delays of eleven, five, twelve and three years sufficient to excuse exhaustion. <u>See</u> <u>Hankins</u>, 941 F.2d at 247 (eleven years to decide motion to withdraw guilty plea sufficient to excuse exhaustion requirement); <u>Burkett</u>, 826 F.2d at 1218 (five year delay sufficient to excuse exhaustion); <u>Codispoti v. Howard</u>, 589 F.2d 135, 142 (3d Cir.1978) (twelve

years to decide new trial motion); <u>United States ex rel. Senk v. Brierley</u>, 471 F.2d 657, 660 (3d Cir.1973) (three year delay in deciding PCHA petition)." <u>Story v. Kindt</u>, 26 F.3d 402, 405-6 (3d Cir. 1994).

Finally, a necessary corollary of this exhaustion requirement is the procedural default doctrine which applies in habeas corpus cases. Certain habeas claims, while not exhausted in state court, may also be incapable of exhaustion in the state legal system by the time a petitioner files a federal habeas petition because state procedural rules bar further review of the claim. In such instances:

> In order for a claim to be exhausted, it must be "fairly presented" to the state courts "by invoking one complete round of the State's established appellate review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 844-45, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). If a claim has not been fairly presented to the state courts and it is still possible for the claim to be raised in the state courts, the claim is unexhausted. . . .
>
> If a claim has not been fairly presented to the state courts but state law clearly forecloses review, exhaustion is excused, but the doctrine of procedural default may come into play. A procedural default occurs when a prisoner's federal claim is barred from consideration in the state courts by an "independent and adequate" state procedural rule. Federal courts may not consider the merits of a procedurally defaulted claim unless the applicant establishes "cause" to excuse the default and actual "prejudice" as a result of the alleged violation of the federal law or unless the applicant demonstrates that failure to consider the claim will result in a fundamental "miscarriage of justice." <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991).

<u>Carpenter v. Vaughn</u>, 296 F.3d 138, 146 (3d. Cir. 2002)(citations omitted).

For purposes of excusing a procedural default of a state prisoner seeking federal habeas relief, "[t]he Supreme Court has delineated what constitutes 'cause' for the procedural default:  the petitioner must 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" Werts v. Vaughn, 228 F.3d 178, 192-193 (3d. Cir. 2000)(citations omitted).  With respect to the what constitutes "cause" excusing a procedural default, it has long been held that constitutionally ineffective representation by state counsel will amount to "cause" excusing a state procedural default. Edwards v. Carpenter, 529 U.S. 446(2000). Thus, " '[C]ounsel's ineffectiveness in failing properly to preserve the claim for review in state court' may suffice for cause under th[is] exception to procedural default." Farmer v. Wilson,  248 F. App'x 291, 294 (3d Cir. 2007)(quoting Edwards).

The type of "prejudice" which may excuse a procedural default is also clearly defined in this setting.  When we consider the claims of a prisoner like Ross, who has been completely denied a state criminal appeal which he specifically and repeatedly requested: "To establish prejudice, 'a defendant must [simply] demonstrate that there is a reasonable probability that, but for counsel's [ineffective assistance], he would have timely appealed.' Flores-Ortega, 528 U.S. at 484, 120 S.Ct. 1029." Hodge v. United States, 554 F.3d 372, 381 (3d Cir. 2009).

## B.   Ross Is Entitled to Reinstatement of His Appeal Rights

Judged against these guiding legal benchmarks, we find that Ross is entitled to habeas corpus relief, in the form of an order reinstating his direct appeal rights.

In reaching this conclusion and recommendation, at the outset we find that the exhaustion and procedural default doctrines do not bar consideration of the merits of this petition.  In this case, when we assess the exhaustion requirement in a practical and common sense fashion, we find that Ross has exhausted his state remedies.  Ross diligently sought to pursue a direct appeal for years, only to be frustrated in those efforts by his own counsel.  Ross then actively pursued state post-conviction relief on three separate occasions, only to have those efforts frustrated when state courts imposed a procedural impediment to his post conviction relief act petition, a procedural impediment that was asserted by the state courts without the benefit of a full factual record regarding the inexcusable ineffectiveness of Ross' initial state post-conviction counsel.  Thus, Ross has done all that the law can reasonably require of him in this particular, and compelling, factual circumstance to exhaust his state remedies.

In any event, the exhaustion doctrine is not a jurisdictional bar to judicial review of a claim.  Rather, it is a doctrine driven by considerations of comity which is also subject to fundamental considerations of equity when there has been an unreasonable

delay in litigating a petitioner's claims.  In this case, we find that there have been lengthy delays in litigating Ross' appeal, delays that are inexcusable and are largely attributable to complete inaction by Ross' first state post-conviction counsel.  In our view, this wholesale failure by counsel to preserve his client's appellate rights is an extraordinary situation which justifies foregoing strict adherence to this exhaustion requirement.  In short, we cannot find that Ross' claims, which were barred for years by counsel's inexcusable inaction, are now procedurally barred under §2254.

But even if we concluded that the Commonwealth could initially raise the procedural bar doctrine as a defense here, we find that Ross has plainly shown both " cause" and "prejudice," which justify excusing this procedural default.  The cause for this default  is clear: " '[C]ounsel's ineffectiveness in failing properly to preserve the claim for review in state court'[] suffice[d] for cause under th[is] exception to procedural default." Farmer v. Wilson, 248 F. App'x 291, 294 (3d Cir. 2007)(quoting Edwards).   Furthermore, when, as here, counsel's ineffectiveness results in the complete denial of an appeal, the prejudice caused by that conduct is manifest: "To establish prejudice, 'a defendant must [simply] demonstrate that there is a reasonable probability that, but for counsel's [ineffective assistance], he would have timely appealed.' Flores-Ortega, 528 U.S. at 484, 120 S.Ct. 1029." Hodge v. United States, 554 F.3d 372, 381 (3d Cir. 2009).  Such prejudice clearly exists here.

Having found that there is no procedural bar to the consideration of this petition on its merits, we also conclude that Ross is entitled to the very narrow form of relief which he seeks, reinstatement of his direct appeal rights. Ross has satisfied all of the requirements necessary to establish an ineffective assistance of counsel claim in this setting. First it is evident that the performance of Ross' first post-conviction counsel in state court "fell below an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 688, since that counsel ignored multiple timely and increasingly urgent requests by Ross to appeal his conviction, and actually withdrew a *nunc pro tunc* notice of appeal that he filed on Ross' behalf. Moreover, a clear, and demonstrable, prejudice to Ross directly flowed from this objectively unreasonable conduct by his former counsel. In the words of the Supreme Court, by failing to file a notice of appeal, despite repeated entreaties from Ross, "[C]ounsel's deficient performance deprived [Ross] of a notice of appeal and, hence, an appeal altogether. . . , counsel's deficient performance has deprived [Ross] of more than a *fair* judicial proceeding; that deficiency deprived [Ross] of the appellate proceeding altogether. . . . The even more serious denial of the entire judicial proceeding itself, which a defendant wanted at the time and to which he had a right,. . . demands a presumption of prejudice. Put simply, we cannot accord any 'presumption of reliability,' to judicial proceedings that never took place " due to counsel's failings. <u>Roe v. Flores-Ortega</u>, 528 U.S. at 483(citations omitted).

Having reached this conclusion and recommendation, we note that nothing in our report and recommendation is intended in any way to suggest any views regarding the merits of any appeal that may be filed by Ross.  The merits of any appeal are matters which are the exclusive province of the state courts.  Rather, we simply conclude that the failure of counsel to preserve Ross' right to appeal in the face of Ross' repeated invocation of that right denied Ross a right guaranteed by the Constitution, and compels very limited habeas corpus relief, the restoration of the appeal rights forfeited by the ineffectiveness of counsel.

## III.   __Recommendation__

Accordingly, for the foregoing reasons, upon consideration of this Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254, and the Response in Opposition to this Petition, IT IS RECOMMENDED that the Petition be GRANTED, and Ross be granted narrow relief in the form of reinstatement of his direct appeal rights in state court, a direct appeal denied Ross through the inaction of his first state post-conviction counsel.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk

of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified   proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 31st day of January 2012.

_**S/Martin C. Carlson**_
Martin C. Carlson
 United States Magistrate Judge